UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAUL ELLIOTT, #613346,

                Petitioner,

                                  CASE NO. 2:09-CV-14486

v.                                 HONORABLE DENISE PAGE HOOD

BLAINE LAFLER,

                Respondent.

_____/

**OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF
HABEAS CORPUS AND DENYING A CERTIFICATE OF APPEALABILITY**

**I.    Introduction**

Michigan prisoner Paul Elliott ("Petitioner") has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. Petitioner was convicted of aggravated stalking, MICH. COMP. LAWS § 750.411i, and two counts of resisting arrest, MICH. COMP. LAWS § 750.81d(1), following a jury trial in the Isabella County Circuit Court in 2006. He was initially sentenced to concurrent terms of 12 months in jail and five years probation on those convictions. After being found guilty of aggravated stalking in another case, he was re-sentenced to two to five years imprisonment on the aggravated stalking conviction in 2007. Petitioner was released on parole on June 14, 2011.

In his pleadings, Petitioner raises claims concerning an amendment to the information, the admission of "other acts" evidence, prosecutorial misconduct, and the effectiveness of trial counsel. Respondent has filed an answer to the petition contending that it should be denied. For the reasons stated herein, the Court concludes that Petitioner is not entitled to federal habeas relief on his claims

1

and denies the petition.  The Court also denies a certificate of appealability.

## II.    Facts and Procedural History

Petitioner's convictions arise from his conduct toward his former fiancee and campus police

officers at Central Michigan University in Mount Pleasant, Michigan in 2005 and 2006.  The

Michigan Court of Appeals described the relevant facts, which are presumed correct on habeas

review, *see Monroe v. Smith*, 197 F. Supp. 2d 753, 758 (E.D. Mich. 2001), *aff'd.* 41 F. App'x 730

(6th Cir. 2002), as follows:

> In the summer of 2004, Elliot met Candace Baldwin at an Amish dinner. At some
> point, they both became students at Central Michigan University (CMU). Baldwin
> testified that the relationship "started out just being friends ... and then we lost touch
> for a couple months, then we were friends again for about three to four months," and
> finally the relationship ended in June 2005, when she broke their engagement and
> attempted to returned her ring to Elliot. However, Elliot did not want the ring back.
> Baldwin then tried to give the ring back a second time with a neighbor as a witness,
> but discovered a few days later that Elliot had left the ring inside her apartment.On
> October 3, 2005, Baldwin told Elliot that she wanted him to leave her alone. Baldwin
> testified that Elliot then threw her on the ground and held her down. Not surprisingly,
> Elliot gave a somewhat different version of the incident, stating that after Baldwin
> had walked away from him without speaking, the following occurred:
>
> > I said why won't you talk to me and I just kind of followed her for a
> > while and I said why don't you talk to me and then I just stupidly,
> > ignorantly grabbed her backpack, uh, spun her around and knocked
> > her to the ground and I don't know how much I pushed or how
> > much-I mean she lost her balance, how much I pushed, I don't know,
> > just, it was just a horrible moment. She started screaming and I just,
> > I just, at that point, I just dropped to my knees cause I knew exactly
> > what she was thinking....
>
> Baldwin and Elliot both stated that this was the only incident of physical aggression
> that Elliot had engaged in against her.
>
> On October 4, 2005, Baldwin took out a personal protection order (PPO) against
> Elliot that required him not come within sight of her, not have telephone contact with
> her, and not contact her through third parties. Elliot knew of the PPO. Baldwin stated
> that she initially felt safe with the PPO until Elliot continued to contact her.

2

Baldwin testified that approximately three to four weeks after the PPO was issued, Elliot said "Hi" to her and asked how she was doing as she was walking to class at CMU. As a result, Baldwin testified, she was unable to concentrate and subsequently erred in a class presentation she had to do that day. For a few days, Elliot also emailed her pretending to be Melissa Williams, a friend of Baldwin's. Because Baldwin believed the emails were from Williams, she responded to them. Baldwin indicated that she would never have opened the emails if she had known they were from Elliot. One of the emails indicated that Williams was trying to get Baldwin to talk with Elliot. Baldwin responded, "no, I can't talk to [Elliot], it would totally defeat the purpose of having a PPO against them [sic]." Although there was nothing overtly threatening in the emails, when Baldwin found out the emails were from Elliot she "freaked right out" and wondered "what he was going to come up with next" to try and contact her.

Baldwin also received text messages from Elliot between September 2005, and January or February 2006. Although the content was "[j]ust silly things," Baldwin testified that she was fearful. Elliot admitted to sending Baldwin a text message saying "Happy Halloween" because he missed her and her son. Baldwin changed her cell phone in February or March of 2006, to prevent receipt of future messages.

According to Baldwin, after the text messaging stopped, Elliot still spoke to her on the CMU campus. In February 2006, when the PPO was still in effect, Elliot approached her as she stood in front of the bookstore and said, "Hi, how are you doing?" Baldwin did not respond, but testified that this incident made her fearful and caused her heart to pound "really hard" because of Elliot's previous attack.

Baldwin also recounted an incident where she was leaving CMU's Brooks Hall and noticed Elliot "just standing at the library looking around." She "darted back" into the building to avoid him and hoped he had not seen her. Baldwin testified that Elliot watched Brooks Hall the entire time he was walking along, before "dart[ing] behind a bush or something." She said that this incident caused her to constantly watch over her shoulder because she was worried Elliot would come up behind her and "throw [her] on the ground again." Baldwin indicated that it was possible that Elliot was at the library because he worked there, and she did not know his working hours. Elliot, however, testified that he was not pursuing Baldwin on campus and that he only said "Hi" on previous occasions because he was nervous when he walked past her.
After the incident at Brooks Hall, Elliot contacted Baldwin twice by phone on March 15, 2006. According to Baldwin, Elliot first called around 9:00 p.m. as she was putting her son to bed. Baldwin initially did not recognize Elliot's voice, but when she realized it was him, she asked what he was doing calling her, at which time Elliot's tone became hostile and he asked her why she was "trying to start trouble." Baldwin hung up on Elliot, called the police, and told them about the conversation. Elliot testified that this call to Baldwin was a mistake because he was actually trying to call Ronald McKay, Baldwin's neighbor. However, although he realized his

3

mistake, he still talked with her.

That same evening, CMU Police Department Officers Scott Malloy and Sergeant Christopher Pryor were dispatched to Elliot's apartment regarding a possible PPO violation. They arrived simultaneously in separate marked vehicles, and both were in full uniform. Elliot let them into the apartment. Elliot initially denied violating the PPO but, according to Pryor's testimony, later admitted to calling Baldwin because he wanted Baldwin to quit harassing him. At trial, Elliot maintained that the call was an accident, but admitted that he never told the officers the call was an accident because they did not ask.

Sergeant Pryor arrested Elliot, but because Elliot was in his pajamas, the police permitted him to go upstairs to change, accompanying him for their own safety to make sure he did not get a weapon. Once upstairs, Elliot "passively resisted" by lying down on his bed and telling the officers he was not going to go with them but would "take care of this it tomorrow." The officers told Elliot that he had to come with them, but he continued to lie on the bed. According to Elliot, he was tired, upset, not thinking, and just needed a minute to collect his thoughts. Elliot described his statement as a request to handle things later and said that after the officers said no, he stood up as they ordered.

According to the officers, however, they physically grabbed Elliot, and he began to actively resist. After the officers pulled him off the bed, Elliot clenched his arms up in front to keep himself from being handcuffed. Elliot admitted he made a brief motion like that, but explained that he thought his muscles tightened from an involuntary muscle response when they grabbed him. Malloy "applied the pressure point," and the officers were eventually able to cuff Elliot's hands behind his back. Once Elliot was cuffed, he stopped resisting. He told the officers that he wanted to change his clothes, but Pryor told him that was no longer an option and had him transported to the Isabella County Jail.

Around 11:30 p.m. that evening, Baldwin received a call from a "1-888" number asking if she would accept a collect call from Elliot, but she hung up without accepting the charge. Thomas Recker, jail administrator for Isabella County, provided phone records showing a call from a jail cell occupied exclusively by Elliot to Baldwin's landline at 11:27 p.m. lasting one minute and ten seconds. At trial, Elliot admitted to making this call.

Baldwin also testified that she and William Comer began dating around August or September 2005, and that Elliot sent emails to Comer to try and break them up. Baldwin stated that at one time she had a hotmail email account but she had shut it off in early 2006. An email sent from that account, purporting to be Baldwin professing her love for Elliot, was sent to Elliot's account on February 13, 2006. The e-mail was then forwarded it to Comer. According to Comer, the contents of the

4

emails from Elliot to him illustrated both the adverse affect Elliot was having on Baldwin and Elliot's knowledge of them. They included statements from Elliot such as: " 'I couldn't believe the things she said especially ... saying how she's so afraid of me. That explains so much why she has been behaving so irrationally the last few months ...' " and that he should not " 'have been sneaky in trying to e-mail her and text-mex [sic] her in November no matter how harmless it seemed. I know it unnerved her and made her more afraid of me. I saw the fear on campus and it scared me back.' "

McKay testified that in September 2005, he had a telephone conversation with Elliot about Baldwin. According to McKay, Elliot got angrier and angrier the more he talked, ultimately threatening to kill Baldwin. McKay told Elliot he was going to call the sheriff, and Elliot told McKay to go ahead and call. McKay testified that when he hung up and contacted the sheriff, Elliot was on another line speaking with a different deputy. After talking with the sheriff, McKay told Baldwin about the conversation "so that she could protect herself." Although Elliot admitted that he told McKay he was going to kill Baldwin, he also said that he was just hurt and did not mean it. Elliot testified that he called McKay back and also called Baldwin because he was "horrified," presumably by what he said.

In March or April 2006, McKay had another telephone conversation with Elliot during which he threatened to sue McKay, Baldwin, Comer and "anybody else that he could sue" and threatened to hurt Baldwin so that she could not marry anyone else. McKay eventually informed Baldwin about this conversation, about four days after it occurred. After initially denying that he said he was going to hurt Baldwin, Elliot later testified that he might have said something like that to McKay.

Elizabeth Pilling, a friend of Baldwin's who was an apartment manager at Elliot's apartment complex also testified at trial. Pilling considered Elliot her friend initially, but that changed after he indicated that there was a PPO he was breaking. Pilling testified that Elliot told her that he was sending emails to Baldwin by posing as Williams to get information from Baldwin because he could not contact her under the terms of the PPO. Pilling's impression was that Elliot thought the PPO "was kind of a joke" and did not think it was important for him to follow it. Elliot also sent emails to Pilling with statements indicating that he knew he was having an adverse affect on Baldwin. An email dated March 17, 2006, stated, "I hate that she feels so fearful and anxious around me." Another email, dated January 27, 2006, stated, "I'm sure she is wondering just who I am, the one full and sweet friend she once loved and considered marrying or the angry, jealous and selfish person who ... selfishly hurt her so badly that she can't stand to be around me for her own peace of mind."

*People v. Elliot*, No. 274131, 2008 WL 2038032, *1-4 (Mich. Ct. App. May 13, 2008) (unpublished).

5

Following his convictions and sentencing, Petitioner filed a motion for a new trial with the trial court, which was denied. Petitioner also filed an appeal of right with the Michigan Court of Appeals, essentially raising the same claims presented on habeas review. The Michigan Court of Appeals denied relief on Petitioner's claims and affirmed his convictions. *Id*. Petitioner then filed an application for leave to appeal with the Michigan Supreme Court, which was denied. *People v. Elliott*, 482 Mich. 1065, 757 N.W.2d 459 (2008).

Petitioner thereafter instituted this federal habeas action, raising the following claims as grounds for relief:

I.     The amendment to the information at the close of trial was a material variance which affected his substantial rights under the Fifth and Fourteenth Amendments.

II.    The trial court improperly admitted "prior bad acts" evidence under MRE 404(b) and failed to provide notice under MRE 404(b)(2).

III.   Trial counsel was constitutionally ineffective and did not protect his substantial rights, including the right to a fair trial.

IV.   Various actions by the prosecutor constituted prosecutorial misconduct, depriving him of a fair trial.

Respondent has filed an answer to the petition contending that it should be denied because the claims have not been fully exhausted, are barred by procedural default, and/or lack merit. Petitioner has amended his petition to delete the unexhausted portion of one claim and has filed a reply to the answer. The matter is ready for decision.

## III.   Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides the following standard of review for federal habeas actions:

An application for a writ of habeas corpus on behalf of a person in custody

6

pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, _ U.S. _, 130 S. Ct. 1855, 1862 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7; *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

7

The Supreme Court recently held that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, _ U.S. _, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* ( citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003). Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, _ U.S. _, 129 S. Ct. 1411, 1419 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 131 S. Ct. at 785. Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it

8

does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16. While the requirements of "clearly established law" are to be determined solely by Supreme Court precedent, the decisions of lower federal courts may be useful in assessing the reasonableness of the state court's resolution of an issue. *See Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

Lastly, a state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

## IV.   Discussion

### A.   Amendment to the Information

Petitioner first asserts that he is entitled to habeas relief because the trial court erred in allowing an amendment to the information at the close of trial. Respondent contends that this claim is barred by procedural default and lacks merit.

Federal habeas relief may be precluded on a claim that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *See Wainwright v. Sykes*, 433 U.S. 72, 85-87 (1977); *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir. 1991). The doctrine of procedural default is applicable when a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2006); *see also Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005); *Coleman v. Mitchell,* 244 F.3d 533, 539 (6th Cir. 2001). "A procedural default does not bar

9

consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263-64 (1989). The last *explained* state court judgment should be used to make this determination. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991).

The Michigan Court of Appeals rendered the last reasoned opinion on this claim. In denying relief on this claim, the court found the issue to be waived based upon the failure to object at trial. *See Elliott*, 2008 WL 2038032 at *4. The failure to make a contemporaneous objection is a recognized and firmly-established independent and adequate state law ground for refusing to review trial errors. *See People v. Carines*, 460 Mich. 750, 763, 597 N.W.2d 130 (1999); *People v. Stanaway*, 446 Mich. 643, 687, 521 N.W.2d 557 (1994); *see also Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991). Moreover, a state court does not waive a procedural default by looking beyond the default to determine if there are circumstances warranting review on the merits. *See Paprocki v. Foltz*, 869 F.2d 281, 285 (6th Cir. 1989). Nor does a state court fail to sufficiently rely upon a procedural default by ruling on the merits in the alternative. *See McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991). The Michigan Court of Appeals denied relief on this claim based upon a procedural default – the failure to object at trial.

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 753; *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996). To establish cause, a petitioner must establish that some external impediment frustrated his ability to comply

10

with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A petitioner must present a substantial reason to excuse the default. *See Amadeo v. Zant*, 486 U.S. 214, 223 (1988). Such reasons include interference by officials, attorney error rising to the level of ineffective assistance of counsel, or a showing that the factual or legal basis for a claim was not reasonably available. *See McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991).

Petitioner alleges ineffective assistance of trial counsel as cause to excuse his default. Petitioner, however, cannot establish that counsel was ineffective or that he was prejudiced because this claim lacks merit. It is well-settled that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). However, a prosecutor has significant discretion in determining what charge to file against an accused provided that probable cause exists to believe that an offense was committed by the accused under the charging statute. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *United States v. Davis*, 15 F.3d 526, 529 (6th Cir. 1994). Moreover, it is well-settled that amendments to a state criminal information are permissible so long as the amendment does not alter the degree of the crime charged or unfairly surprise the defendant. *See, e.g., Wright v. Lockhart*, 854 F.2d 309, 312 (8th Cir. 1988); *Sharrar v. Foltz,* 658 F. Supp. 862, 866-67 (E.D. Mich. 1987) (changing date of alleged sexual assault just before trial did not sufficiently prejudice petitioner where he failed to identify additional witnesses or show that he would have conducted his defense differently).

In this case, the Michigan Court of Appeals reviewed the merits of this claim in the alternative and found it to be without merit. The court explained:

> In any event, we see no error in the amendment of the information. Under MCL 767.76, a trial court has the discretion to amend an information before, during, or after a trial so long as the amendment does not unduly prejudice the defendant. A defendant is unduly prejudiced by an amendment to an information if it unfairly

11

surprises the defendant, causes the defendant to have insufficient notice of the charges, or deprives the defendant of a sufficient opportunity to present a defense.

Our review of the record indicates that defense counsel was fully aware that contacts other than the two phone calls were going to be presented at trial and that Elliot had a sufficient opportunity to defend. Defense counsel specifically referred to the email communications in his opening statement and his cross-examination of the various witnesses focused on the contents of the other contacts and whether there was anything threatening about them. At no time did defense counsel ever object or indicate any type of surprise from the evidence being presented. Moreover, defense counsel argued the following in closing:

> [T]here was a lot of contact and I, and we're not going to hide that. We didn't try to hide that yesterday. We knew that, we knew that there was going to be plenty of evidence showing several instances of contact. We're, we're just saying that the contact happened, yes. Should it have caused her or a reasonable person to suffer emotional distress, that's questionable, okay. There may be room for doubt there. [Emphasis added.]

Consequently, we conclude that there was no surprise, there was sufficient notice, and Elliot was not deprived of his opportunity to present a defense.

*Elliott*, 2007 WL 2038032 at *4-5 (footnoted state law citations omitted).  This decision was reasonable and did not contradict clearly established Supreme Court precedent.  Petitioner was well aware of his contacts with the victim, as was defense counsel and he had ample opportunity to defend against the charges.  He has failed to establish a due process violation.

Petitioner has also not shown that a fundamental miscarriage of justice has occurred.  The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent.  *See Schlup v. Delo,* 513 U.S. 298, 326-27 (1995). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency."  *Bousley v. United States*, 523 U.S. 614, 624 (1998).  "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence –

12

that was not presented at trial." *Schlup*, 513 U.S. at 324. Petitioner has made no such showing. This claim is thus barred by procedural default, lacks merit, and does not warrant habeas relief.

**B.      Other Act Evidence**

Petitioner also asserts that he is entitled to habeas relief because the trial court erred in admitting other acts evidence and such evidence was admitted without proper notice under the Michigan Rules of Evidence. Respondent contends that this claim is not cognizable on habeas review and lacks merit.

Alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Serra v. Michigan Dept. of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). In other words, "[t]rial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action, unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (quoting *McGuire*, 502 U.S. at 69-70); *see also Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

As to the admission of prior acts, the United States Supreme Court has declined to hold that similar "other acts" evidence is so extremely unfair that its admission violates fundamental conceptions of justice. *See Dowling v. United States*, 493 U.S. 342, 352-53 (1990).[1] Thus, "[t]here

---

[1]While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.

13

is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d 496, 512 (6th Cir. 2003). Consequently, there is no Supreme Court precedent that the state court decisions could be deemed "contrary to" under 28 U.S.C. § 2254(d)(1). *Id*. at 513; *see also Adams v. Smith*, 280 F. Supp. 2d 704, 716 (E.D. Mich. 2003). Moreover, Petitioner's claim that the state trial court violated the Michigan Rules of Evidence by admitting the other acts evidence is not cognizable on habeas review. *See, e.g., Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007). Petitioner has thus failed to state a claim upon which habeas relief may be granted as to this issue.

Furthermore, even if Petitioner states a cognizable claim, he is not entitled to relief. Petitioner has not shown that the disputed evidence rendered his trial fundamentally unfair. As explained by the Michigan Court of Appeals in reviewing this issue under state law, the evidence was relevant under the amended information and was admissible without notice. *See Elliott*, 2008 WL 2038032 at *5. Petitioner has not shown that the admission of this evidence was erroneous or, more importantly, that it rendered his trial fundamentally unfair. The state court's denial of relief was neither contrary to Supreme Court precedent nor an unreasonable application thereof. Habeas relief is not warranted on this claim.

### C.     Prosecutorial Misconduct

Petitioner also asserts that he is entitled to habeas relief because the prosecutor engaged in misconduct by improperly referring to an October 3, 2005 incident, mis-characterizing Petitioner's actions as an assault, arguing facts not in evidence, eliciting hearsay testimony, asking leading questions, and denigrating the defense. Respondent contends that these claims are barred by procedural default and lack merit.

14

As noted, federal habeas relief may be precluded on a claim that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *Wainwright*, 433 U.S. at 85-87; *Couch*, 951 F.2d at 96. The doctrine of procedural default is applicable when a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *See White*, 431 F.3d at 524; *see also Howard*, 405 F.3d at 477. For a procedural default to apply, the state court must 'clearly and expressly' rely on a state procedural bar. *Harris*, 489 U.S. at 263-64. The last *explained* state court judgment should be used to make this determination. *Ylst*, 501 U.S. at 803-05.

The Michigan Court of Appeals rendered the last reasoned opinion on these claims. In denying relief, the court relied upon the failure to object at trial. *See Elliott*, 2008 WL 2038032 at *7. The failure to object is a recognized and firmly-established independent and adequate state law ground for refusing to review trial errors. *See Carines*, 460 Mich. at 763; *Stanaway*, 446 Mich. at 687; *see also Coleman*, 501 U.S. at 750-51. Moreover, the state court did not waive the procedural default by conducting a plain error review of the claims. *See Girts v. Yanai*, 501 F.3d 743, 755 (6th Cir. 2007); *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). The Michigan Court of Appeals denied relief on these claims based upon a procedural default – the failure to object at trial.

Accordingly, the Court must determine whether Petitioner has demonstrated cause and prejudice to excuse his default, or has shown that a fundamental miscarriage of justice has occurred. *See Coleman*, 501 U.S. at 753; *Gravley*, 87 F.3d at 784-85; *see also Murray*, 477 U.S. at 488; *McCleskey*, 499 U.S. at 493-94. Petitioner again alleges ineffective assistance of trial counsel as cause to excuse his default. Petitioner cannot establish cause or prejudice, however, as his

15

prosecutorial misconduct claims lack merit for the reasons stated by the Michigan Court of Appeals in reviewing them for plain error. *See Elliott*, 2008 WL 2038032 at *8-9.

Petitioner has failed to show that the prosecutor's questions and arguments were improper and/or were so flagrant as to render his trial fundamentally unfair. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) (setting forth two-part test). First, the prosecutor properly referred to the October 3, 2005 incident because it was relevant to the issuance of the PPO, as well as Petitioner's intent and common plan for the stalking charge. The prosecutor's characterization of the incident was also appropriate given the testimony that Petitioner grabbed the victim and knocked her to the ground. The prosecutor was entitled to comment on the evidence and argue reasonable inferences from that evidence. *See Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000).

Second, the prosecutor did not argue facts not in evidence by using a hypothetical to explain how Petitioner's individual contacts caused the victim to experience emotional distress. Third, the prosecutor did not elicit hearsay from the victim regarding why she obtained a PPO because her testimony about what Petitioner said to her neighbor was not offered for the truth of the matter asserted but was intended to show what enticed her to act. Fourth, the claimed "other acts" evidence was properly admitted as relevant to the charged offense such that the prosecutor did not err in failing to provide notice under state evidentiary rules. Fifth, the prosecutor did not ask leading questions which suggested the correct answer on direct examination. Moreover, as noted by the Michigan Court of Appeals, such questions are not necessarily improper under state law.

Lastly, the prosecutor did not denigrate Petitioner or the defense. A prosecutor may argue from the facts that a witness is (or is not) worthy of belief. *See Portuondo v. Agard*, 529 U.S. 61,

16

69 (2000). While it is inappropriate for a prosecutor to make personal attacks on a defendant or defense counsel, *see, e.g., United States v. Young*, 470 U.S. 1, 9 (1985), a prosecutor may highlight inconsistencies or inadequacies in the defense, *see Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005), and point out the lack of evidence supporting the defense theory. *See United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005). The prosecutor did that here. To the extent that any of the prosecutor's remarks can be seen as derogatory, they were not so flagrant as to deny Petitioner a fundamentally fair trial.

Moreover, the trial court instructed the jury about the elements of the crime and the burden of proof, and explained that the attorneys' questions and arguments are not evidence. Jurors are presumed to follow the court's instructions. *See Penry v. Johnson*, 532 U.S. 782, 799 (2001) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)); *United States v. Powell*, 469 U.S. 57, 66 (1984) ("Jurors . . . take an oath to follow the law as charged, and they are expected to follow it."). Petitioner has failed to show that the prosecutor engaged in misconduct which rendered his trial fundamentally unfair.

Furthermore, as discussed *supra*, Petitioner has not shown that a fundamental miscarriage of justice has occurred. *See Schlup,* 513 U.S. at 324, 326-27; *see also Bousley*, 523 U.S. at 624. His prosecutorial misconduct claims are thus barred by procedural default, lack merit, and do not warrant habeas relief.

### D.    Effectiveness of Trial Counsel

Lastly, Petitioner asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to object to the amendment of the information, for failing to object to "other acts" evidence, for failing to object to the admission of the original PPO and not offering the

17

amended PPO, for failing to object to leading questions, for failing to object to the prosecutor's closing argument, for failing to request a unanimity instruction, and effectively abandoning the defense during opening and closing arguments. Respondent contends that these claims lack merit.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received the ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. Second, the petitioner must establish that counsel's deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id.*

As to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. *Id.* at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 689. Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690. The petitioner bears the burden of overcoming the presumption that the challenged actions were sound trial strategy. *Id.* at 689.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* "On balance, 'the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result.'"

18

*McQueen v. Scroggy*, 99 F.3d 1302, 1311-12 (6th Cir. 1996) (quoting *Strickland*, 466 U.S. at 686).

The Supreme Court has recently confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S. Ct. at 788 (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Id*. at 788.

Applying the *Strickland* standard, the Michigan Court of Appeals denied relief on each of these claims. The court explained in relevant part:

> Because there was no error in amending the information, defense counsel cannot be faulted for failing to challenge the amendment or for failing to raise an other-acts objection to the admission of evidence regarding the additional contact. Elliot's alternative position that defense counsel should have raised a free speech claim regarding the contacts with third parties is also without merit. We have previously held that Michigan's anti-stalking laws do not violate a defendant's right to free speech under the United States and Michigan Constitutions, and that communications sent to third parties that were intended to reach the person protected by a PPO constituted a violation of the PPO and did not infringe on violator's freedom of speech. Accordingly, defense counsel was not ineffective for failing to advocate this meritless position.

> Elliot also asserts that counsel should have offered the amended PPO into evidence to refute one of the unconsented contacts and should have objected to the admission of the original PPO. Even assuming that if the amended PPO had been offered it would have refuted one of the alleged contacts, Elliot has failed to show that there was a reasonable probability that the outcome of trial could be different. Evidence of conversations at the campus bookstore, emails, text messages, and telephone calls in violation of the PPO could form the basis of the stalking conviction.

> We also conclude that the original PPO was properly admitted. Elliot has not provided a copy of the PPO and none was found in the lower court record, so we are

19

unable to determine what statements were contained in the PPO to determine whether they constituted hearsay. Even so, the admission of the PPO was proper under MCL 600.2106, which provides that "[a] copy of any order ... of any court of record in this state ... shall be admissible in evidence in any court in this state, and shall be prima facie evidence of ... all facts recited therein...." Because the PPO was properly admitted, defense counsel did not err by failing to object to its admission.

Elliot asserts that counsel should have objected to questions posed by the prosecutor to Baldwin that Elliot characterizes as leading. While all of the challenged questions asked Baldwin whether she possessed a certain emotional state at a given time, they did not necessarily suggest the desired answer. Most of the questions begin with interrogatory words like "when" and "were" and "did," which suggest that the prosecutor was seeking information as opposed to suggesting an answer. In fact, more than one of the responses coming from Baldwin went beyond mere acquiescence to a proposition proposed in the question, which indicates that she was not simply parroting back an answer suggested by the question. Moreover, the context in which some of the questions were posed shows that they were follow-up questions designed to develop her testimony in terms of the requirements of the statute. Finally, we note that MRE 611(c)(1) indicates that leading questions "should not be used on ... direct examination," which is short of a categorical statement that such questions "shall not be used." Accordingly, we conclude that Elliot has failed to establish that he was denied the effective assistance of counsel with respect to the alleged leading questioning by the prosecutor. Again, counsel cannot be faulted for failing to raise a futile objection.

Elliot asserts that defense counsel failed to object to the prosecutor's conduct during closing arguments and that this constituted ineffective assistance of counsel. We address the propriety of the prosecutor's actions below and conclude that no misconduct occurred in this respect. Accordingly, defense counsel was not ineffective for failing to raise futile objections.

Elliot also argues that defense counsel should have requested a jury instruction regarding unanimity. Elliot's separate challenge to the failure to provide such an instruction was waived. Nevertheless, our analysis of this issue through the ineffective assistance rubric shows that the instruction was not required under the circumstances. Criminal defendants are entitled to unanimous jury verdicts, and the trial court must properly instruct the jury accordingly. Elliot received a general unanimity instruction, and the jurors were polled after the verdict. A more detailed unanimity instruction is not required simply because a single charge could be based on more than one underlying event. When there is evidence of multiple acts used to establish a single charged offense, a general unanimity instruction is sufficient unless:

> 1) the alternative acts are materially distinct (where the acts themselves are conceptually distinct or where either party has

> offered materially distinct proofs regarding one of the alternatives), or 2) there is reason to believe the jurors might be confused or disagree about the factual basis of defendant's guilt.
>
> We note that in *People v. Cooks*, a second-degree criminal sexual conduct case, the Michigan Supreme Court rejected the need for a specific unanimity instruction, noting that the defendant had not presented a separate defense for the multiple acts presented to the jury or offered materially distinct evidence of impeachment regarding any particular act. In the present case, Elliot admitted each contact, and the testimony was generally consistent regarding the content of the communications. Elliot's defense was that those contacts should not have caused a reasonable person to suffer emotional distress. In other words, Elliot presented the same defense for each of the acts and did not offer any impeachment of the acts, having admitted that each of the contacts occurred. Accordingly, no unanimity instruction was necessary and defense counsel cannot be faulted for failing to request one.

*Elliott*, 2008 WL 2038032 at *5-7 (footnotes and citations omitted).

This decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof.  Given the state court's determination that the information was properly amended, that the "other acts" evidence was properly admitted and no notice was required under state law, that the original PPO was properly admitted, that the prosecutor did not engage in misconduct, and that a specific unanimity instruction was not required under state law, Petitioner cannot establish that trial counsel was ineffective as to such matters.  Counsel cannot be deemed deficient for failing to make a futile objection or motion.  *See, e.g., McQueen*, 99 F.3d at 1316. Additionally, the state court reasonably determined that Petitioner failed to establish that counsel erred and/or that he was prejudiced by counsel's conduct in not offering the amended PPO into evidence.  Having reviewed the record as a whole and given the significant evidence of Petitioner's guilt presented at trial, the Court finds that Petitioner has not shown that trial counsel was deficient or that he was prejudiced by counsel's conduct so as to that counsel was ineffective under the *Strickland* standard.  Habeas relief is not warranted on these claims.

21

## V.      Conclusion

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on the claims contained in his petition.   Accordingly, the Court **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus.

Before Petitioner may appeal the Court's decision, a certificate of appealability ("COA") must issue.  *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).  A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When a federal district court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the constitutional claim debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  A court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the habeas claims.  *Id*. at 336-37.

When a federal district court denies relief on procedural grounds without addressing the merits of a claim, a certificate of appealability should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the court was correct in its procedural ruling.  *See Slack*, 529 U.S. at 484-85.

Having considered the matter, the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right as to his habeas claims and that reasonable jurists could not debate the Court's procedural rulings.   Accordingly, the Court

**DENIES** a certificate of appealability.

      **IT IS ORDERED.**

                **s/Denise Page Hood**                    
                **United States District Judge**

**Dated:  June 30, 2011**

**I hereby certify that a copy of the foregoing document was served upon Paul Elliott, 200 Easton SE, Grand Rapids, MI 49503 and  counsel of record on June 30, 2011, by electronic and/or ordinary mail.**

                **s/LaShawn R. Saulsberry**           
                **Case Manager**